**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| ADAM BAXTER and DAVID OSTLUND, derivatively on behalf of UNITED DEVELOPMENT FUNDING IV, <br><br> Plaintiffs, <br><br> -against- <br><br> HOLLIS M. GREENLAW, PHILIP K. MARSHALL, J. HEATH MALONE, STEVEN J. FINKLE, STACEY H. DWYER, TODD ETTER, UMTH GENERAL SERVICES, L.P., UMTH LAND DEVELOPMENT, L.P., UNITED MORTGAGE TRUST, UMT SERVICES, UMTH HOLDINGS, L.P., UNITED DEVELOPMENT FUNDING, L.P., UNITED DEVELOPMENT FUNDING, INC., UNITED DEVELOPMENT FUNDING II, INC., UNITED DEVELOPMENT FUNDING III, INC., and UNITED DEVELOPMENT FUNDING X, INC., <br><br> Defendants, <br><br> -and- <br><br> UNITED DEVELOPMENT FUNDING, IV, <br><br> Nominal Defendant. | Case No.: _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## ORIGINAL COMPLAINT

Plaintiffs Adam Baxter and David Ostlund ("Plaintiffs"), by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant United Development Funding, IV ("UDF IV" or the "Company"), due to the acts of UDF IV, and make the following allegations against certain members of UDF IV's Board of Trustees (the "Board") and senior level executives and officers of the Company. The allegations of this Complaint are

based on the personal knowledge of Plaintiffs, as to themselves and their own acts, and upon information and belief, as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, news reports, press releases, various court documents, and other publicly available documents and information concerning UDF IV and the matters contained herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiffs on behalf and for the benefit of UDF IV.  Plaintiffs allege claims of breach of fiduciary duty, unjust enrichment, and corporate waste against UDF IV's Board.  As alleged herein, the Board must be held accountable for its wrongdoing and mismanagement, which has already exposed the Company to crippling risks and damages in the form of civil lawsuits and government enforcement actions.

2.      UDF IV is a real estate investment trust ("REIT") that issues loans to acquire and develop residential communities.  What distinguishes REITs from other real estate companies is that an REIT must acquire and develop its real estate properties primarily to operate them as part of its own investment portfolio, as opposed to reselling those properties after they have been developed.[1]  REITs are accordingly barred from conducting "prohibited transactions" according to §857(b)(6) of the Internal Revenue Service Tax Code in order to receive certain income tax exemptions.  The tax exemption prevents double taxation that most public corporations are subjected to, but prohibits REITs from certain dealer activities, including the development and sale of residential lots.  Income derived from "prohibited transactions" is taxed at 100% in order

---

[1]      *See Fast Answers: Real Estate Investment Trusts (REITS)*, SEC.GOV (Jan. 12, 2012), https://www.sec.gov/answers/reits.htm (last accessed July 14, 2017).

to prevent REITs from engaging in these activities, such as sales to customers of subdivided lots in a development project.

3.      While many REITs prove to be superb investments, UDF IV has recently been revealed as a massive Ponzi scheme.  UDF IV loans and receives money to/from other related entities, *e.g.*, United Development Fund I, United Development Fund III, and United Development Fund V (the "Related Entities").  With money received from these other entities, UDF IV repays money it borrowed in previous years.  The loans themselves do not generate any cash income for the Company, however.  Moreover, many of the properties UDF IV owns have never been developed to support any commercial purpose, nor generated any income for the Company.

4.      In addition, UDF IV has issued loans primarily to land developers, with 67% of loans purportedly to one developer in North Texas: Centurion American.  UDF IV purports to primarily generate income from loans secured by real estate, structured as debt, which would otherwise qualify as rent on real property.  However, the underlying activities securing many of these loans are land development for sale of residential lots, which are closer to equity investments for the development of land.  UDF IV is involved in many interested transactions with these borrowers and it has been alleged that UDF IV utilized "straw borrowers" – entities which it controls – to circumvent the limitations of the REIT tax structure by issuing loans and charging interest to shell entities.[2]

5.      These activities, pursued directly through an REIT, would be considered prohibited transactions.  UDF IV's loans to these development partners have characteristics of

---

[2]      *See Is UDF IV a Legitimate Real Estate Investment Trust?*, HAYMAN CAP. MGMT., L.P. (Aug. 2016), https://udfexposed.com/assets/content/News__Research_-_Is_UDF_a_Legitimate _REIT.pdf (last accessed July 14, 2017).

equity investments, rather than debt, and due to the use of straw borrowers, have the effect of allowing the Company to circumvent REIT limitations to sell subdivided lots of development projects to customers.  These prohibited transactions would subject the Company to potentially severe tax consequences and financial disclosure consequences.  UDF IV carried out this scheme through extensive financing arrangements conducted with its Related Entities.

6.      UDF IV's scheme began with RCS Capital, a broker-dealer founded and formerly chaired by Nicholas Schorsch ("Schorsch").  RCS Capital sold securities in UDF IV and the Related Entities to retail investors.  This money was then passed between UDF IV and the Related Entities and lent to developers, including Centurion American, a development company owned by Mehrdad Moayedi ("Moayedi") and Thomas Buffington ("Buffington").  With the money raised and filtered through UDF IV and the Related Entities, UDF IV paid dividends that exceed the cash generated by UDF IV's operations.

7.      A review of the Company's lending practices supports the conclusion that the Board has been operating a Ponzi scheme.  UDF IV's loan portfolio is dangerously concentrated with just a handful of borrowers – 88% of UDF IV's loans are either to Centurion American, Buffington, or other UDF IV-related entities.  Centurion American and Buffington do not appear to be able to repay the loans in a timely manner, according to public filings.  Furthermore, a number of UDF IV's loans to Centurion American contain unusually high debt service requirements (approximately 13% annual interest on average) and have not resulted in any cash receipts to UDF IV.

8.      It also appears that a number of UDF IV's loans are secured by unimproved property.  This fact expressly contradicts public statements made by UDF IV's management in filings with the SEC.  Several supposed development sites in fact contain no development

whatsoever.  Indeed, representatives of Hayman Capital Management LP ("Hayman") traveled to supposed development sites, only to find that no development was taking place.  For example, the Alpha Ranch Development site outside of Fort Worth, Texas, is completely desolate, producing no income for its "developer," Centurion American.  Similar defunct developments with suspect transactions and transfers between UDF IV and Related Entities include Preston Manor in Lubbock, Texas, and Northpointe Crossing in Anna, Texas.

9.      Additionally, the Board has allowed UDF IV's executives to enter into a number of self-interested transactions.  These transactions consist, in part, of deficient loans that have been accruing interest at below-market rates.  These loans have been deficient for several years and currently amount to approximately $73 million.  The Board has allowed UDF IV to avoid recognizing these loans as losses, but rather, assets in the form of "deficiency notes" and "recourse obligations."

10.     The exposure of UDF IV as a Ponzi scheme, and the mismanagement by the Board, has resulted in significant damage to the Company.  First, these revelations caused UDF IV's stock to drop $6.05 per share on December 10, 2015 – a 35% drop.  On that day, UDF IV finally acknowledged that it had been under SEC investigation since April of 2014.  The disclosure of the SEC investigation caused the Company's stock to fall another $2.60 per share, or 23%, to close at $8.55 per share on December 11, 2015.  Then, on February 18, 2016, the Federal Bureau of Investigation ("FBI") raided UDF IV's offices.  The FBI raid resulted in the Nasdaq stock market ("NASDAQ") halting trading of UDF IV stock.  As of the date of this filing, the trading halt status on UDF IV stock has not been lifted.

11.     UDF IV, at the direction of its Board, also violated §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by filing Proxy Statements on May 29,

2014 and April 30, 2015 that contained false and misleading statements and omissions in that they failed to disclose the foregoing material information in soliciting the reelection of the Board.

12.     This litigation on behalf of UDF IV seeks to rectify the conduct of the individuals bearing ultimate responsibility for the Company's conduct – the Company's current and former trustees and senior management – and to impose appropriate responsibility upon those individuals.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims asserted herein arise under §§14(a) and 29(b) of the Exchange Act (15 U.S.C. §§78n(a) and 78cc(b)).

14.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

15.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant has committed acts related to the claims at issue in this Complaint within this District, is a resident within this District, and/or has sufficient minimum contact with this District, so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §1391(b)(2) because Nominal Defendant UDF IV is headquartered in Grapevine, Texas and a substantial portion of the events and wrongs complained of herein originated or occurred in this District.

## THE PARTIES

18.     Plaintiffs are current shareholders of UDF IV and have held the Company's stock continuously from December 6, 2012 to the present.  Plaintiffs are residents of Nevada and Texas.

19.     Nominal Defendant UDF IV is a public, non-traded REIT organized in Maryland in 2008 with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.  UMTH General Services, L.P. ("UMTH General") is UDF IV's advisor and UMTH Land Development, L.P. ("Land Development") is UDF IV's asset manager. UDF IV conducts its business primarily through its wholly owned subsidiaries, which include at least 11 Delaware limited partnerships, 11 Delaware limited liability companies, and seven Delaware corporations.  UDF IV is traded on the NASDAQ under the symbol "UDF IV."

20.     Defendant Hollis M. Greenlaw ("Greenlaw") has served as the Board's Chairman and the Company's Chief Executive Office ("CEO") since UDF IV's formation in 2008. Greenlaw is a resident of Texas. In addition, Greenlaw:

- has been held out as Land Development's CEO since 2003 and was previously its president from March 2003 until June 2011;

- owns 50% and has been the president, CEO, and a director of UMT Services since March 2003;

- owns 30% and has been a partner, vice-chairman, and CEO of Defendant UMT Holdings, L.P. ("UMT Holdings") since March 2003;

- owns 33.75% and is president, CEO, and a director of United Development Funding, Inc. ("UDF I Inc."), a Delaware corporation and United Development Funding, L.P.'s ("UDF I") general partner;

- owns 50% and is president, CEO, and a director of United Development Funding II, Inc. ("UDF II Inc."), United Development Funding II, L.P.'s ("UDF II") general partner;

- is CEO and a director of United Development Funding X, Inc. ("UDF X Inc."), a Delaware corporation and the general partner of United Development Funding X, L.P. ("UDF X"); and

- is CEO and Chairman of the Board for UDF IV and United Development Funding Income Fund V ("UDF V").

21.      Defendant Philip K. Marshall ("Marshall") has served as a member of the Board since 2008.  Marshall is the Chairman of the Board's Audit Committee.  While working for the accounting firm Whitley Penn LLP, Marshall served as the audit partner for Defendant United Mortgage Trust ("UMT").  Marshall is a resident of Texas.

22.      Defendant Steven J. Finkle ("Finkle") has served as a member of the Board since 2008.  Finkle is the Chairman of the Board's Compensation Committee.  Finkle is a resident of Maryland.

23.      Defendant J. Heath Malone ("Malone") has served as a member of the Board since 2008.  Malone is the Chairman of the Board's Nominating and Governance Committee. Malone is a resident of Texas.

24.      Defendant Stacey H. Dwyer ("Dwyer") has served as a member of the Board since 2014.  Dwyer is the Company's Chief Operating Officer ("COO") and has served in that capacity since February 17, 2014.  It is unclear from UDF IV's public filings when Dwyer transitioned to become a trustee, but UDF IV stated, in a February 5, 2014 press release, that

Dwyer worked with the Board from her inception as COO "to effect the strategic growth objectives and capital market transactions of UDF IV."[3]  Dwyer is a resident of Texas.

25.     Defendants Greenlaw, Marshall, Finkle, Malone, and Dwyer served on the Board (equivalent to the board of directors at most public companies) during the time that the misconduct alleged herein occurred and are collectively referred to as the "Trustee Defendants."

26.     Defendant Todd Etter ("Etter") is: (a) the Chairman and a partner of UMTH General; (b) a half owner and director of UMT Services (the general partner of UMTH General and Land Development); and (c) a principal or affiliate of several other entities that are related to UDF IV and the Related Entities.  In addition, Etter:

- has been held out as Defendant Land Development's executive vice president since 2003;

- is a 50% owner of Defendant UMT Services, along with Greenlaw, and has been chairman and director of UMT Services since its formation in 2003;

- owns 30% of UMT Holdings;

- owns 33.75% and is held out as chairman of UDF I Inc.;

- owns 50% and is chairman of UDF II Inc.;

- is executive vice president and director of UDF X Inc.; and

- has been the chairman of UMTH General, the advisor to UMT, since 1996.

27.     Defendant UMT is a public, non-traded REIT organized in Maryland in 1996. UMT has no employees.  UMTH General provides UMT's day-to-day operations, including

---

[3]     Press Release, United Development Funding, United Development Funding IV Welcomes Stacey H. Dwyer as Chief Operating Officer (Feb. 5, 2014), http://www.udf online.com/united-development-funding-iv-welcomes-stacey-h-dwyer-chief-operating-officer/ (last accessed July 14, 2017).

providing it with administrative services, facilities, negotiating purchases of loans, overseeing the acquisition or disposition of investments, and managing UMT's assets.  Defendant UMTH General, a Delaware limited partnership, is a subsidiary of Defendant UMT Holdings and is controlled by UMT Services, Etter, and Greenlaw.

28.    Defendant UMTH General is owned by Defendants UMT Services and UMT Holdings.  UMTH General is the supposedly external advisor to UMT and UDF IV.  UMTH General also assists Land Development in the management of United Development Funding III, L.P. ("UDF III").

29.    Defendant Land Development is the Company's asset manager, as well as the general partner of UDF III and asset manager of United Development Funding Land Opportunity Fund, L.P. ("UDF LOF").  Land Development is a Delaware limited partnership formed in 2003. Land Development also:

- owns a 49.99% subordinated profits interest in UDF I;

- provides asset management services for UDF I, UDF II, UDF TX Two, L.P., UDF LOF, and UDF IV;

- holds a 99.9% partnership interest in UDF X, with the remaining 0.1% interest owned by UMT Services; and

- owns 100% of the interests in UDF Land GP, LLC, which serves as the general partner of UDF Land GenPar, L.P., the general partner of UDF LOF.

30.    Defendant UDF X is a limited partnership organized in Delaware in 2007.  UDF X is a wholly owned subsidiary of Land Development.

31.    Defendant UDF I is a private limited partnership originally organized in Nevada in 2003 and reorganized in Delaware in 2008.  UDF I Inc. serves as general partner for UDF I

and owns a 0.02% general partnership interest.  Land Development owns a 49.99% subordinated profits interest in UDF I and unaffiliated limited partners own the remaining 49.99% of the interests in UDF I.

32.     Defendant UMT Services is a Delaware corporation formed in 2003.  Defendants Etter and Greenlaw each own 50% of the equity interests in UMT Services and serve as directors of UMT Services.  Greenlaw is the President and CEO of UMT Services.  In addition, UMT Services:

- owns 0.1% of the limited partnership interests in Defendant Land Development and serves as its general partner;

- owns 0.1% of the limited partnership interests in UMT Holdings and serves as its general partner;

- holds 0.1% interest in UDF X; and

- is the general partner of UMTH General.

33.     Defendant UMTH Holdings is a Delaware limited partnership.  As of December 31, 2014, 99.9% of UMT Holdings is owned by Individual Defendants as follows: Etter (30%); and Greenlaw (30%).  UMT Services also owns 0.1% of UMT Holdings and is UMT Holdings' general partner.  In addition, UMT Holdings:

- holds 99.9% of the limited partnership interests in Defendant Land Development; and

- is a limited partner of UMTH General.

## FACTUAL ALLEGATIONS

### A.     Company Background

34.     UDF IV was organized on May 28, 2008 as a Maryland REIT.  UDF IV controls various limited partnerships through which the Company operates its business.  According to its most recent Annual Report on Form 10- K filed with the SEC on March 16, 2015 (the "2014 10-K"), UDF IV primarily originates, purchases, participates in, and holds for investment secured loans used for the acquisition and development of real property as single-family residential lots or mixed-use master planned residential communities, for the construction of single-family homes, and for completed model homes.  In addition, the Company purports to make direct investments in land for development into single-family lots, home construction, and portfolios of finished lots and model homes and provides credit enhancements to real estate developers, home builders, land bankers, and other real-estate investments.

35.     Beginning in 2010, the Company made an election to be taxes as an REIT.  REIT status allows the Company to avoid generally paying federal income tax on income that is distributed to UDF IV shareholders.

36.     UDF IV is one of several affiliated funds.  The other members of the United Development Funding family are UMT, UDF I, UDF II, UDF III, UDF V, and UDF LOF (collectively, the "Related Funds").  The Related Funds are public non-traded REITs, whereas UDF IV is publicly traded on the NASDAQ.

37.     Like UDF IV, the Related Funds primarily originate and invest in loans for the acquisition and development of single-family residential lots.  In that vein, UDF IV's and the Related Funds' businesses overlap to a large extent.  For example, transactions with UDF IV's largest borrower, Centurion American, constitute 43% of UDF II's, 67% of UDF IV's, and 62% of UDF V's businesses, respectively.

38.     Defendant Land Development provides advisory services to UDF I, UDF II, UDF IV, and UDF LOF.

39.     In addition, UDF IV's and the Related Funds' management overlap to a great extent.  Greenlaw is the co-founder of UDF III and has served as CEO and Chairman of the Board of Trustees of UDF V since June 2012.  Likewise, Marshall, purportedly an independent trustee, is also a trustee of UMT.

40.     UDF IV illustrated its organizational structure with the following diagram in its filings with the SEC:



41.     On April 22, 2014, the Company adopted its Code of Business Conduct and Ethics (the "Ethics Code").[4]   The Ethics Code acknowledges that a commitment to "the highest standards of business conduct . . . requires that [UDF IV] conduct [its] business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics . . . .   All trustees, officers and employees of the Trust are expected to understand, respect and comply with this Code and all of the laws, regulations, policies and procedures that apply to them in their positions with the Trust."

42.     The Ethics Code addresses conflicts of interest that may arise on the part of Board members, officers, and employees.   Specifically, the Ethics Code states that the Company's Board members, officers, and employees "should avoid any action or interest that conflicts with, or gives the appearance of a conflict with, the Trust's interests."   According to the Ethics Code, "[a] 'conflict of interest' exists whenever an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Trust."   The Ethics Code further states that a conflict of interest will result if a Board member or officer "receives improper personal benefits as a result of his or her position with the Trust, whether from a third party or from the Trust."   Regarding the reporting of a conflict of interest, the Ethics Code recommends that "[a]ny employee, officer or trustee that becomes aware of a conflict or potential conflict should bring it to the attention of higher levels of management, the board of trustees, the Chief Executive officer, the Chief Operating Officer or the General Counsel."

43.     Greenlaw is both the Chairman of the Board and the CEO of the Company. According to UDF IV's most recent Schedule 14A Proxy Statement filed with the SEC on April 30, 2015 (the "2015 Proxy"), the purportedly independent trustees of the Board believe that

---

[4]        *Available at* http://www.udfonline.com/code-of-conduct/ (last accessed July 14, 2017).

maintaining Greenlaw as both the Chairman and CEO is appropriate because the CEO "is ultimately responsible for [the Company's] day-to-day operations and for executing [its] business strategy, and because [UDF IV's] performance is an integral part of the deliberations of [the Board.] . . .  In addition, although [UDF IV does] not have a lead independent trustee, [the Board] believes that the current structure is appropriate, as [UDF IV is] externally managed by UMTH General Services, LP ('UMTH [General]' or our 'Advisor'), whereby all operations are conducted by our Advisor or its affiliates."

44.    The Board has approved the concentration of the Company's most powerful offices – Chairman of the Board and CEO – in Greenlaw, at least in part because the Company is purportedly "externally managed by UMTH General Services, LP . . . ."  According to the 2015 Proxy, however, Greenlaw is a partner, Vice Chairman and CEO of UMT Holdings, L.P. ("UMTH") and a President, CEO, and a director of UMT Services, Inc. ("UMT Services"). Indeed, according to the Company's 2014 10-K, UMTH General "engaged [Land Development] as [UDF IV's] asset manager to oversee the investing and financing activities of the affiliated programs managed and advised by the Advisor and [Land Development]."  Again, Greenlaw has also served as CEO of [Land Development].  The general partner of UMTH [General] is also the general partner of [Land Development].

### B.    Further Background Regarding the Formation of Affiliated Entities

45.    UMT is a Maryland REIT formed in 1996.  UMT has been externally managed by an advisor controlled by Defendant Etter since its formation.  The 1996 UMT Prospectus stated that UMT would use the services of affiliates of the advisor to service the mortgages assumed by UMT, and that the advisor and UMT affiliates would receive substantial compensation in connection with the organization of UMT, investment of the proceeds, and management of UMT's investments.

46.     In March 2003, Etter and Greenlaw and their affiliates formed UMT Services, Inc., a Delaware corporation, and a number of subsidiary entities for the purpose of raising and directing investor capital to use in their self-dealing and self-enriching investment activities. UMT Holdings, UMTH General, and Land Development were formed as Delaware limited partnerships with UMT Services as General Partner for each.  UDF I Inc. was formed on May 1, 2003 as a Nevada corporation to serve as the General Partner of UDF I, a Nevada limited partnership formed in June 11, 2003.  UDF II Inc. was formed on July 19, 2004 as a Nevada Corporation to serve as the General Partner of UDF II, formed as a Nevada limited partnership on July 16, 2004.  In January 2008, the Trustee Defendants reorganized UDF I and UDF II as Delaware limited partnerships by filing certificates in Delaware.

47.     UDF I raised investor capital beginning in 2003, and UDF II raised investor capital beginning in 2004.  Etter and Greenlaw and their affiliates directed UMT funds and assets to UDF I and UDF II.  According to UMT's May 26, 2004 Proxy Statement, "On January 1, 2005, effective September 30, 2004, [UMT] entered into a First Amended of Restated Secured Line of Credit Promissory Note and an Amended and Restated Security Agreement . . . with [UDF I]."  As alleged herein, Etter and Greenlaw and their affiliates directed UMT, UDF I and UDF II to invest heavily in real estate loans to certain favored real estate developers to benefit and enrich themselves.  The collapse of the real estate bubble translated into losses in these investments.

48.     On September 1, 2005, UMT entered into an agreement to merge with and into UMT Holdings with the continued business to be managed by UMT Services under the control of Etter and Greenlaw. The Form 8K announcing the merger agreement stated, among other things, that UMT Holdings and UMT's adviser were "controlled by the same persons and, as

related parties, they have potential conflicts of interest arising out of the Merger." The merger agreement was terminated in June 2006 and the merger did not close. In August 2006, UMTH General became the advisor of UMT.

49. UDF III was formed as a Delaware limited partnership in June 2005, with Land Development as its General Partner. UDF X was formed as a Delaware limited partnership in Delaware in 2007. According to filings that UDF X made with the State of Texas, Greenlaw serves as UDF X's President and Chief Executive Officer, and Etter and Greenlaw serve as directors.

50. Defendant UMTH General is UMT's advisor. Defendant UMTH General is a subsidiary of Defendant UMT Holdings. Defendant UMTH General provides advisory services to UDF IV. Defendants Etter and Greenlaw are directors of Defendant UMTH General.

### C.      The Board's Structure and Duties

51. The Board has four committees: Audit; Compensation; Nominating and Governance; and a Special Committee. According to the Company's 2015 Proxy, the Board claimed responsibility for UDF IV's shareholders' and other stakeholders' interest in the long-term health and the overall success of the Company and its financial strength. The Board claimed to be "actively involved in overseeing risk management for the [Company]" by exercising its "approval of all investments and all assumptions of debt, as well as its oversight of the [Company's] executive officers and oversight of [UDF IV's] corporate governance policies through the proceedings of our independent audit, compensation, and nominating and corporate governance committees." According to the 2015 Proxy, the Board discussed material violations of UDF IV's policies which are "brought to its attention on an ad hoc basis, and once per year reviews a summary of the finance-related violations." Material violations of UDF IV's Code of Business Conduct and Ethics and related corporate policies were reported to the Board.

52.     The Audit Committee is composed of Defendants Marshall, Finkle, and Malone (the "Audit Committee").   According to the 2015 Proxy, the Audit Committee selects the Company's "independent registered public accounting firm . . . reviews with the independent registered public accounting firm the plans and results for the audit engagement, approves the audit and non-audit services provided by the independent registered public accounting firm, reviews the independence of the independent registered public accounting firm, considers the range of audit and non-audit fees and reviews the adequacy of our internal controls."   The Audit Committee reportedly reviewed risks related to financial reporting.   The Audit Committee also reportedly met with UDF IV's CEO, Advisor, and representatives of its independent registered public accounting firm on a quarterly basis to discuss and assess the risks related to the Company's internal controls.

53.     The Compensation Committee is composed of Defendants Finkle and Marshall (the "Compensation Committee").   The Compensation Committee acts under its charter, which was adopted April 22, 2014.   The Compensation Committee, among other things, is responsible for reviewing the Company's advisory agreement with UMTH General.   Pursuant to its charter, the Compensation Committee must "evaluate annually the performance of the Advisor in light of the goals and objectives of the Company and the terms of the Advisory Agreement, taking into account such factors as the Compensation Committee shall consider relevant, and report to the Board the Compensation Committee's views regarding the performance by the Advisor."[5]

54.     Like the Audit Committee, the Nominating and Governance Committee is composed of Defendants Malone, Finkle, and Marshall (the "Nominating and Governance

---

[5]     *Available at* http://www.udfonline.com/compensation-committee-charter/ (last accessed July 14, 2017).

Committee"). The Nominating and Governance Committee acts under its charter, which was adopted April 22, 2014. Pursuant to its charter, the Nominating and Governance Committee is "responsible for overseeing the evaluation of the Board as a whole and management and shall evaluate and report to the Board on the performance and effectiveness of the Board."[6] To that end, the Nominating and Governance Committee is required to "establish procedures to allow it to exercise this oversight function." Further, in reviewing candidates for the Board, the Nominating and Governance Committee is required to consider, among other things, conflicts of interest. Such nominations, however, are only to be made "[a]fter consultation with the Chairman and Chief Executive Officer[.]" Likewise, the Nominating and Governance Committee "review[s] the suitability for continued service as a trustee of each Board member when his or her term expires and when he or she has a change in status, including but not limited to an employment change, and to recommend whether or not the trustee should be re-nominated." Accordingly, the Nominating and Governance Committee has a continuing duty to monitor the conflicts of interest of each member of the Board and to take such conflicts of interest into account when deciding whether to recommend that individual for re-nomination to the Board.

### D.     Related-Party Transactions

55.     As referred to above, the Company is involved in a number of related-party transactions. According to the 2014 10-K, "[f]or the years ended December 31, 2014, 2013, and 2012, approximately $10.1 million, $8.2 million and $4.2 million, respectively" was paid to UMTH General, the Company's Advisor. Likewise, as of December 31, 2014, the Company

---

[6]     *Available at* http://www.udfonline.com//nominating-governance-committee/ (last accessed July 14, 2017).

accounted for approximately $1.2 million as accrued liabilities owing to UMTH General as management fees. Again, UMTH General is controlled by Greenlaw.

56. The following table represents debt financing fees paid to UMTH General by the Company:

| Facility | 2014 | 2013 | 2012 |
|---|---|---|---|
| Credit Facility | $ - | $ 13,000 | $ 20,000 |
| Waterfall 4 Loan | 87,000 | - | - |
| Waterfall 3 Loan | 19,000 | - | - |
| UDF IV HF CTB Revolver | 150,000 | 52,000 | 27,000 |
| CTB Revolver | 45,000 | 111,000 | 45,000 |
| UTB Revolver | - | 8,000 | 13,000 |
| Prosperity Revolver | 61,000 | 33,000 | 60,000 |
| Legacy Revolver | - | 4,000 | 50,000 |
| Veritex Revolver | 39,000 | 21,000 | 6,000 |
| Affiliated Bank Revolver | 35,000 | 11,000 | - |
| UDF IV Fin VII Legacy Revolver | 60,000 | 21,000 | - |
| UDF IV Fin VI CTB Revolver | 141,000 | 52,000 | - |
| Independent Bank Revolver | 78,000 | 6,000 | - |
| Capital Bank Revolver | 1,000 | - | - |
| **Total** | **$716,000** | **$332,000** | **$221,000** |

57. In addition, the Company has incurred acquisition and origination fees payable to Land Development, an entity affiliated with Greenlaw. Specifically, "[f]or the years ended December 31, 2014, 2013 and 2012, approximately $(2.2) million, $9.5 million and $5.2 million, respectively" was incurred by UDF IV and payable to Land Development.

58. The following table summarizes the approximate amounts paid by UDF IV to related parties during the fiscal years ended December 31, 2014 and 2013:

| Payee | Purpose | 2014 | | 2013 | |
|---|---|---|---|---|---|
| UMTH General | O&O Reimbursement | $ - | - | $ 8,167,000 | 33% |
| | Management Fees | 9,751,000 | 87% | 7,819,000 | 32% |
| | Debt Financing Fees | 754,000 | 7% | 361,000 | 1% |
| | Advisor Expense Reimbursement | 12,000 | * | - | - |
| Land Development | Acquisition and Origination Fees | 259,000 | 2% | 7,953,000 | 33% |
| UDF III | Credit Enhancement Fees | 416,000 | 4% | 132,000 | 1% |
| **Total Payments** | | **$11,192,000** | **100%** | **$24,432,000** | **100%** |

Less than 1%

59.     Similarly, the following table summarizes the approximate expenses associated with related parties for the fiscal years ended December 31, 2014, 2013, and 2012:

For the Year Ended December 31

| Purpose | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| Management Fees | $10,077,000 | 100% | $8,162,000 | 100% | $4,187,000 | 100% |
| Total Management Fees – Related Party | $10,077,000 | 100% | $8,162,000 | 100% | $4,187,000 | 100% |
| Amortization of Debt Financing Fees | $    716,000 | (76)% | $   332,000 | 3% | $   222,000 | 4% |
| Acquisition and Origination Fees | (2,160,000) | 228% | 9,504,000 | 95% | 5,188,000 | 93% |
| Credit Enhancement Fees | 484,000 | (51)% | 120,000 | 2% | 177,000 | 3% |
| Advisor Expense Reimbursement | 14,000 | (1)% | - | - | - | - |
| **Total General and Administrative – Related Parties** | **$(946,000)** | **100%** | **$9,959,000** | **100%** | **$5,587,000** | **100%** |

## E.     UDF IV Is Alleged to Be a Ponzi Scheme

60.     As a result of the lack of oversight provided by the Board and the inherent conflicts of interest involved in many of the Company's transactions, investors have made allegations of wrongdoing on the part of the Company and the Board.  Among them, Hayman has produced several presentations and created a website dedicated to exposing UDF IV as a fraud.  Indeed, according to Hayman, UDF IV operates in a manner that appears very similar to that of a Ponzi scheme, whereby UDF IV supposedly loans and receives money to or from the Related Entities.  Then, with that money, UDF IV is able to repay money it borrowed in previous years.   All the while, the loans themselves generate minimal, if any, cash income for the Company.

61.     For example UMT's business has consistently declined since 2005, with cash from operations dropping from more than $14 million in 2005 to a loss of more than $2 million in 2014.  Nonetheless, UMT has paid consistent dividends of $4.00 per share from 2009 through

2014.  During this time, UMT has been able to maintain liquidity by borrowing from UDF IV and UDF III.[7]

62.     Hayman explained how the Company's management and the Related Entities obscure information on the balance sheets of the various UDF IV entities.  UMT lends money to both related and unrelated parties, which is used to make loans.  If UMT or the borrower forecloses on the underlying collateral for less than the outstanding balance on the loan, the borrower has the option to either repay the full amount of the loan or deliver to UMT "an unsecured deficiency note in the amount of the deficiency."  In similar situations, UMT will issue a "recourse obligation" on the shortfall.

63.     One entity that owes such recourse obligations is Ready America Funding Corp. ("RAFC"), a company 50% owned by South Central Mortgage, Inc. ("SCMI").  SCMI, in turn, is owned by Todd Etter, a partner in UMTH.  According to its quarterly report on Form 10-Q filed by UMT with the SEC on November 13, 2015, UMT foreclosed on the real estate securing an RAFC loan, the estimated value of which was $5,135,000, on September 14, 2015.  This left a deficiency of $10,695,254 that was guaranteed by RAFC.  This deficiency was merely added to UMT's "RAFC Recourse Obligation" balance.  The unpaid principal balance of the loan on December 31, 2014 was approximately $15,830,000.

64.     As further evidence of mismanagement and failure of oversight by the Board, Hayman has also pointed to the fact that UDF IV's loan portfolio is dangerously concentrated in just two borrowers.  According to Hayman, 88% of UDF IV's loans are made either to Centurion

---

[7]     *See* "UDF Management Lacks Credibility: How UDF Management Has Not Recognized Realized Losses in a Public Affiliate," February 2016, *available at* https://udfexposed.com/assets/content/News_Research_-_Case_Study_Deficiency_Notes_2_16_16_%28FINAL%29.pdf (last accessed July 17, 2017).

American, Thomas Buffington, or the Related Entities.[8]   According to the Company's public filings, Centurion American and Buffington have been unable to repay the loans in a timely manner.   Furthermore, a number of UDF IV's loans to Centurion American contain unusually high debt service requirements (approximately 13% annual interest rate on average). Nonetheless, UDF IV has not received any cash income from these loans.

65.     Specifically, Hayman alleges that 67% of UDF IV's loans are owed by Centurion American and that these loans typically do not generate actual cash income.   When the loans are not repaid, the loans are repeatedly extended without an extension fee.   For instance, Hayman identified a loan made to CTMGT Alpha Ranch, LLC, a Centurion American/Mehrdad Moayedi entity.   As of December 31, 2012, the outstanding balance was approximately $11 million and set to mature on July 31, 2014.   The collateral securing the loan was a second lien on 1,122 acres of land.   As of September 30, 2015, the outstanding balance had increased to $21.8 million and the maturity date had been extended to October 31, 2015.   From 2012 through September 30, 2015, however, the Company had not received a single dollar in cash receipts from the loan. Similar circumstances were noted relating to One Windsor Hills L.P., CTMGT Granbury, LLC, CTMGT Montalcino, LLC, CTMGT Regatta, LLC, CTMGT Regatta II, LLC, CTMGT Williamsburg, LLC, CTMGT Williamsburg 1B FL-2, LLC, CTMGT Frisco 122, LLC, Travis Ranch (TR) Participation, and CTMGT Frontier 80, LLC, other Centurion American/Mehrdad Moayedi entities.   In each case, the outstanding balance continually increased over several years without financial benefit to the Company.   Indeed, only the loan on Travis Ranch (TR)

---

[8]     *See* "A Rolling Loan Gathers No Loss: Irregular Patterns Related to UDF's Largest Borrower," January 2016, *available at* https://udfexposed.com/assets/content/UDF_Loan_ Patterns_1_28_16.pdf (last accessed July 17, 2017).

Participation generated any cash receipts for UDF IV whatsoever – a total of $719,432 on a loan that had a principal balance of $17.8 million as of September 30, 2015.

66.     The favorable treatment of Centurion American and its CEO Mehrdad Moayedi is not coincidental.  According to Hayman, Moayedi has significant ties to UDF IV and the Related Entities: (1) Greenlaw and Moayedi co-own or recently owned a private jet together; (2) Centurion American and a private UDF IV affiliate co-own a Dallas high-rise condo building; (3) Centurion American and a private subsidiary of UDF I shared a 50/50 partnership to purchase and sell residential lots near Austin, Texas; and (4) UDF IV over-lent to Centurion American, which redirected excess funds to UDF I without any apparent reason to do so.[9] Accordingly, Hayman has identified Centurion American/Moayedi as a critical conduit for UDF IV management to move funds between the UDF IV entities.  In addition to doing business as Centurion American, Moayedi controls CTMGT, LLC ("CTMGT").

67.     Similar treatment has been extended to Buffington-related borrowers.  According to Hayman, Buffington loans account for 10% of UDF IV's loan assets.  Of these loans, six have matured without being extended or repaid.

68.     The following table, compiled from information identified in state UCC filings, depicts the number of loans for which a Buffington borrower, Buffington Land Development, LLC, is named as a debtor and for which UDF I, UDF III, or UDF IV is named as a creditor:

| UDF Trust Making Loan | Number of Loans |
|---|---|
| United Development Funding IV (UDF IV) | 9 Loans |
| United Development Funding, L.P. (UDF I) | 27 Loans |
| United Development Funding III, L.P. (UDF III) | 27 Loans |

---

[9]     *See* "One Example of Many: UDF's High Flying Conflicts of Interest," January 2016, *available at* https://udfexposed.com/assets/content/A_High_Flying_Conflict_of_Interest_1_ 28_16.pdf (last accessed July 17, 2017.)

69.     The following table, compiled from information identified in state UCC filings, depicts the number of loans for which Moayedi, doing business as CTMGT, or an affiliate is named as a debtor and for which UMT, UDF I, UDF III, UDF LOF, UDF IV, UDF V or UDF X is named as a creditor:

| UDF Trust Making Loan | Number of Loans |
|---|---|
| United Development Funding IV (UDF IV) | 49 Loans |
| United Development Funding, L.P. (UDF I) | 13 Loans |
| United Development Funding III, L.P. (UDF III) | 31 Loans |
| United Development Funding Income Fund V (UDF V) | 2 Loans |
| United Development Funding X, L.P. (UDF X) | 1 Loan |
| United Mortgage Trust (UMT) | 2 Loans |
| United Development Funding Land Opportunity Fund, L.P. (UDF LOF) | 8 Loans |

70.     Consequently, Defendants caused a substantial majority of UDF IV's assets to be concentrated in loans and guarantees to (i) related entities owned and/or controlled by the Trustee Defendants, and (ii) Buffington-controlled entities, including Centurion American, and their affiliates.   UDF IV's capital has been funneled directly to Trustee Defendant-affiliated entities and to interested developer parties in order that those entities could satisfy massive debt obligations to affiliated entities owned and/or controlled by the Trustee Defendants.  The Trustee Defendants utilized UDF IV's capital for their own benefit and have perpetuated a fraud upon UDF IV and its stockholders.

71.     The Ponzi-like scheme was concealed in several ways:

- behind a complex web of multiple entities;

- by the complexity and opaqueness of real estate backed loans;

- by omissions and misrepresentations about the financial condition and track record of the affiliated entities and real estate funds; and

- by the omission and misrepresentation of the identities of, and concentration of investments in, two real estate developers that have been the primary recipients of tens of millions of dollars in loans from several of the real estate funds.

72.     The Trustee Defendants perpetuated and concealed their self-dealing and self-enrichment by raising new capital from investors, but the reports disseminated by Hayman have revealed that the affiliated entities are using new investor money to pay distributions to the earlier affiliated entities' investors.

73.     At bottom, according to UDF IV's 2014 10-K, UDF IV paid $51.2 million ($42.3 million in cash) in distributions to shareholders.  At the same time, however, only $42.7 million in cash was generated from operations.  Accordingly, approximately $9.6 million in distributions had to be funded by borrowing, according to the 2014 10-K.

74.     On May 23, 2016, UDF IV made an 8-K filing with the SEC in which it announced that it had defaulted on a $35 million term loan from an unaffiliated party.  Under the terms of the forbearance agreement reached with the lender's successors-in-interest, UDF IV agreed to suspend its shareholder distributions, to use a portion of its cash flow to pay interest and principal on the loan, and to refrain from originating any new mortgage loans and from incurring additional debt without the consent of the lender's successors-in-interest.

75.     UDF IV's default on this loan serves as evidence that the Trustee Defendants' self-dealing and self-enriching conduct has been dependent upon their ability to raise capital from new investors through successive affiliated entities.  Within three months of the suspension of UDF V's securities offering on March 6, 2016, UDF IV defaulted on a loan and was forced to enter into a forbearance agreement that not only prevents it from making shareholder distributions but prevents it from originating new loans, its primary business activity.

1.      **Further UDF IV Mismanagement and Accounting Irregularities**

76.     On October 30, 2015, a lawsuit was filed against BHM Highpointe, Ltd., a UDF IV borrower and Buffington entity, and the Company, alleging fraud, breach of contract, tortious interference, and fraudulent transfer.

77.     On November 19, 2015, Whitley Penn LLP, the Company's auditor, informed UDF IV "that it has declined to stand for reappointment as the Company's independent registered public accounting firm."[10]  Whitley Penn likewise declined to stand for reappointment as the auditor for the Related Entities.  Again, Defendant Marshall served as the audit partner for Whitley Penn in charge of auditing UMT.

78.     On November 24, 2015, William Kahane resigned from UDF V's board of trustees.  Kahane is a founding partner at AR Capital.  Just a week prior, AR Capital announced that it would stop creating and selling nontraded REITs – the very type of investment vehicle that UDF V is.  Kahane founded AR Capital with Nicholas Schorsch, who was also a principal shareholder of RCS Capital and Realty Capital Securities.  RCS Capital filed a petition for protection under Chapter 11 of the U.S. Bankruptcy Code in late January 2016.

79.     On December 28, 2015, yet another lawsuit was filed against the Company in Fort Bend County, Texas.  This lawsuit alleges a fraudulent scheme involving fake borrowers was orchestrated by UDF IV's management.

80.     Hayman has also alleged that at least five of UDF IV's loans are secured by unimproved property.  Hayman, which is also based in the Dallas area, has represented that members of its staff have travelled to the parcels securing the loans and personally observed and

---

[10]     *See* Form 8-K filed with the SEC by the Company November 24, 2015.

photographed their undeveloped status.  This fact expressly contradicts public statements made by UDF IV's management in public filings with the SEC.

81.     The Trustee Defendants' perpetuation of the Ponzi-like scheme has been aided by their use of the same auditor and legal advisor for the related entities.  For over ten years, Whitley Penn was the accounting firm and auditor to UDF IV, and for UMT Holdings, UMT, UDF I, UDF III, and UDF V.  Whitley Penn resigned as auditor to the affiliated entities in November 2015.  The Public Company Accounting Oversight Board ("PCAOB"), the nonprofit corporation established by Congress to protect investors and the public interest by promoting informative, accurate, and independent audit reports and to oversee the audits of public companies and broker-dealers, issued an inspection report just days prior to Whitley Penn's resignation identifying deficiencies in the performance of Whitley Penn's work.

### 2.     The Government Takes Action and the Company Is Delisted from NASDAQ

82.     The myriad irregularities and suspicious circumstances surrounding UDF IV and the Related Entities have not gone unnoticed.  As finally disclosed by the Company on December 10, 2015, the SEC began investigating UDF IV in April 2014.  It is worth noting that this fact was only disclosed after short sellers began publicizing adverse allegations against the Company and the Related Entities, *i.e.*, that they are run like a Ponzi scheme.

83.     On February 18, 2016, the Federal Bureau of Investigation raided UDF IV's offices.  FBI agents were seen carrying boxes of material out of the Company's offices.  UDF IV's stock plunged 55% on the NASDAQ after the FBI raid was announced.  The FBI, however, did not comment on the investigation.

84.     On March 17, 2016, the Company received a notice from NASDAQ that, because the Trust had not yet filed its 2015 Form 10-K with the SEC, it was not in compliance with the

continued listing requirements set forth in NASDAQ Listing Rule 5250(c)(1).  The Trust appealed to the NASDAQ Hearings Panel, and on July 25, 2016, the Trust received written notice that the panel had determined to continue listing UDF IV's securities on NASDAQ, subject to the condition that the Trust filed a Form 10-K with the SEC by September 12, 2016.

85.     UDF IV subsequently requested an extension to comply with the September 12, 2016 filing deadline, and the NASDAQ panel granted an extension of the deadline to October 17, 2016.

86.     On October 13, 2016, UDF IV informed NASDAQ that it would not be able to meet the October 17, 2016 extended deadline for filing its 2015 Form 10-K and 2016 Forms 10-Q with the SEC as a result of UDF IV's auditors requiring more time to complete an "audit."  In addition, through an October 18, 2016 public filing, UDF IV notified shareholders that it had received a "Wells Notice" from the staff of the SEC's division of enforcement.  UDF IV announced that the Wells Notice stated that SEC staff had made a preliminary determination to recommend that the SEC file an enforcement action against the trust and certain unnamed individuals associated with UDF IV.  UDF IV also stated that it was currently unable to predict how long the SEC process would last, the outcome of the SEC's investigation, or any action that the SEC may decide to pursue, and could not predict the impact on UDF IV as a result of any proposed or actual enforcement action.

87.     As a result of the foregoing, UDF IV filed a November 10, 2016 Form NT 10-Q explaining why the Company had not filed a timely quarterly report, merely repeating that Whitley Penn, the Company's former independent registered public accounting firm, had notified the Company that it declined to stand for reappointment in November 2015.  The Company also stated that while it "is working diligently to complete and file all necessary

periodic reports as soon as practicable, [] there can be no assurance when the Registrant will be able to file such periodic reports," with no further justification for its delay. The Company filed Form NT 10-Qs stating that the Company could not file current reports for four consecutive quarters, on May 11, 2016, August 10, 2016, November 10, 2016, and May 10, 2017. The Company also filed a notice of inability to file an annual report on Form NT 10-K on March 17, 2017.

88.     On May 17, 2017, NASDAQ announced that it would delist the common shares of UDF IV. Trading in UDF IV's common shares had been halted since February 2016 and was suspended on October 19, 2016. The delisting became effective on May 18, 2017, when NASDAQ filed a Form 25 announcing the delisting.

### 3.     Securities Fraud Suits Are Filed Against the Company

89.     Not surprisingly, the financial markets have reacted to the negative information relating to the Company. Specifically, after the December 10, 2015 short seller accusations, UDF IV stock fell $6.05 per share to close at $11.15 per share, a 35% drop. Following the Company's acknowledgement of the SEC investigation, the Company's stock fell another $2.60 per share, or 23%, to close at $8.55 per share on December 11, 2015.

90.     Following the decline of the trading price of the Company's stock, several federal securities class action lawsuits were filed against UDF IV in the United States District Court for the Northern District of Texas.[11] These suits allege that UDF IV issued false and misleading statements that misled the investing public regarding UDF IV's provision of liquidity to the Related Entities, that if the flow of retail capital to UDF IV was halted, the earlier Related

---

[11]     *Carter v. United Development Funding IV*, Case No. 3:15cv4030 (Dec. 21, 2015); *The Charles G. and Rose M. Fairbanks Living Trust v. United Development Funding IV*, Case No. 3:15cv4055 (Dec. 23, 2015); and *Anderson v. United Development Funding IV*, Case No. 3:16cv456 (Jan. 7, 2015).

Entities would fail, that the Company was under SEC investigation, and that the Company's financial statements and future prospects were misleading.

> **F.     The UDF IV Board Campaigns for Retention While Withholding this Material Information from Shareholders**

91.     On May 29, 2014, the UDF IV Board of Trustees caused UDF IV to issue a false and misleading proxy statement in connection with its 2014 Annual Meeting of Shareholders that was held on July 25, 2014 (the "May 2014 Proxy"), at which UDF IV's shareholders were to vote on the election of the five nominees for the Board listed in the proxy, including Trustee Defendants Greenlaw, Marshall, Finkle, Malone, and Dwyer.

92.     In violation of Section 14(a) of the Exchange Act, the May 2014 Proxy contained false and misleading statements and omissions.

93.     The May 2014 Proxy misleadingly represented that UDF IV's Board exhibited "high standards of integrity, commitment and independence of thought," stating in full regarding the Company's Trustee Qualifications:

> We believe our board of trustees should encompass a diverse range of talent, skill and expertise sufficient to provide sound and prudent guidance with respect to our operations and interests. ***Each trustee also is expected to: exhibit high standards of integrity, commitment and independence of thought and judgment; use his or her skills and experiences to provide independent oversight to our business; participate in a constructive and collegial manner; be willing to devote sufficient time to carrying out their duties and responsibilities effectively; devote the time and effort necessary to learn our business and our board of trustees; and represent the long-term interests of all shareholders. We have determined that our board of trustees as a whole must have the right mix of characteristics and skills for the optimal functioning of the board in its oversight of the Trust.*** We believe our board of trustees should be comprised of persons with skills in areas such as: finance; real estate; strategic planning; leadership of business organizations; and legal matters. In addition to the targeted skill areas, our board of trustees looks for a strong record of achievement in key knowledge areas that it believes are critical for trustees to add value to the board, including:
>
> - Strategy – knowledge of our business model, the formulation of business strategies, knowledge of key competitors and markets;

- Leadership – skills in coaching and working with senior executives and the ability to assist the Chief Executive Officer;

- Relationships – understanding how to interact with investors, accountants, attorneys, analysts and markets in which we operate; and

- Functional – understanding of finance matters, financial statements and auditing procedures, technical expertise, legal issues, information technology and marketing.

[Emphasis added.]

94.     This statement was false and misleading in the absence of the disclosure that the Board of Trustees was allowing UDF IV to operate essentially as a Ponzi scheme and allowing UDF IV's executives to enter into a number of self-interested transactions consisting, in part, of deficient loans that had been accruing interest at below-market rates.

95.     In addition, the May 2014 Proxy included a listing of "Certain Conflict Resolution Procedures" regarding deals UDF IV made with related entities:

*In order to reduce or eliminate certain potential conflicts of interest, our declaration of trust contains a number of restrictions relating to transactions we enter into with our Advisor and its affiliates and allocation of investment opportunities among affiliated entities*.  These restrictions include, among others, the following:

- *We will not purchase or lease properties in which our Advisor, any of our trustees or any of their respective affiliates, has an interest unless a majority of the trustees, including a majority of the independent trustees, not otherwise interested in such transaction determines that such transaction is fair and reasonable to us and at a price to us no greater than the cost of the property to the seller or lessor, unless there is substantial justification for any amount that exceeds such cost and such excess amount is determined to be reasonable.  In no event will we acquire any property at an amount in excess of its appraised value*.  We will not sell or lease properties to our Advisor, any of our trustees or any of their respective affiliates unless a majority of the trustees, including a majority of the independent trustees, not otherwise interested in the transaction determines that the transaction is fair and reasonable to us.

- *We will not make any loans to our Advisor, any of our trustees or any of their respective affiliates, except that we may make or invest in mortgage loans involving our Advisor, our trustees or their respective affiliates,*

*provided that an appraisal is obtained from an independent expert concerning the underlying property from and independent expert who is in the business of rendering opinions regarding the value of assets of the type held by us and who is qualified to perform such work. In addition, a majority of the trustees, including a majority of the independent trustees, who are not otherwise interested in the transaction must approve all transactions with our Advisor or its affiliates as being fair and reasonable to us and on terms and conditions not less favorable to us than those available from unaffiliated third parties.* We also will obtain a mortgagee's or owner's title insurance policy or a commitment as to the priority of the secured loan as part of our underwriting process. Furthermore, our Advisor, any of our trustees and any of their respective affiliates will not make loans to us or to joint ventures in which we are a joint venture partner unless approved by a majority of the trustees, including a majority of the independent trustees, not otherwise interested in the transaction as fair, competitive and commercially reasonable, and no less favorable to us than comparable loans between unaffiliated parties.

* * *

- *We will not enter into any other transaction with our Advisor or its affiliates, including the acceptance of goods or services from our Advisor or its affiliates,* unless a majority of our trustees, including a majority of the independent trustees, not otherwise interested in the transaction approves such transaction as fair and reasonable to us and on terms and conditions not less favorable to us than those available from unaffiliated third parties.

* * *

[Land Development] is the asset manager of UDF I, UDF II, UDF LOF and us and the general partner of UDF III. In exercising its duties to each of these funds, *[Land Development] will manage each investment in accordance with the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of the respective fund as each investment progresses. UDF I, UDF II, UDF III, UDF LOF and we each recognize that, in exercising its duties to each fund, [Land Development] will encounter conflicts of interest. Thus, each of these funds and [Land Development] seeks to equitably apportion investment opportunities among and between such entities in accordance with each fund's investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances at the time each transaction opportunity is presented by [Land Development].*

* * *

In determining whether or not a transaction opportunity is suitable for more than one program, *our Advisor, subject to approval by our board of trustees, shall examine*, among others, the following factors:

- the anticipated cash flow of the property to be acquired or underlying the secured loan and the cash requirements of each program;

- the effect of the investment both on diversification of each program's investments by type of property and geographic area;

- the policy of each program relating to leverage;

- the income tax effects of the investment to each program;

- the size of investment; and

- the amount of funds available to each program and the length of time such funds have been available for investment.

If a subsequent development, such as a delay in the closing of an investment, causes any such investment, in the opinion of our Advisor, to be more appropriate for a program other than the program committed to make the investment, our Advisor may determine that another program affiliated with our Advisor or its affiliates will make the investment. ***Our board of trustees, including our independent trustees, has a duty to ensure that the method used by our Advisor for the allocation of investments by two or more affiliated programs seeking to make similar types of investments is applied fairly to us***.

[Emphasis added.]

96.     This statement was false and misleading in the absence of the disclosure that the Company was misstating its accounting results and financial condition in order to provide favorable treatment on loans made to related entities in a manner resembling a Ponzi scheme, as described *supra*, ¶¶60-75. This statement was also false and misleading in that it omitted the conflicts of interest and the lack of independence among the Board of Trustees discussed *supra*, ¶¶4-10, 45-50.

97.     These false and misleading statements and omissions were an essential link in the election of the Trustee Defendants to the UDF IV Board. This May 2014 Proxy harmed UDF IV by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. For example, as a result of their election to the Board, the Trustee Defendants continued to harm UDF IV by loaning money to interested

parties ("straw borrowers") to circumvent the limitations of the REIT tax structure, dangerously concentrating UDF IV's loan portfolio into just a handful of interested parties.

98.     On April 30, 2015, the UDF IV Board of Trustees caused UDF IV to issue a false and misleading proxy statement in connection with its 2015 Annual Meeting of Shareholders that was held on June 25, 2015 (the "April 2015 Proxy"), at which UDF IV's shareholders were to vote on the election of the five nominees for the Board listed in the proxy, including Trustee Defendants Greenlaw, Marshall, Finkle, Malone, and Dwyer.

99.     In violation of Section 14(a) of the Exchange Act, the April 2015 Proxy contained false and misleading statements and omissions.

100.    The April 2015 Proxy misleadingly represented that UDF IV's Board exhibited "high standards of integrity, commitment and independence of thought," with language identical to that quoted from the May 2014 Proxy in ¶93.  This was false and misleading for the reasons stated in ¶94.

101.    The April 2015 Proxy removed the Conflict of Resolution Procedures section found in the May 2014 Proxy.  In its stead, the following misleading statements were placed in the April 2015 Proxy for "Policies and Procedures – Related Party Transactions":

*General*

In compliance with NASDAQ listing requirements, our independent trustees or a committee comprised solely of independent trustees conducts an appropriate review and oversight of all related party transactions (other than de minimis transactions) for potential conflict of interest situations on an ongoing basis.  Our policies and procedures for the review, approval or ratification of related party transactions are described below.

- Loan Participation Interest – Related Parties and Notes Receivable – Related Parties.  ***A majority of our trustees (including a majority of our independent trustees) who are not otherwise interested in these transactions approve or ratify our loan participation interest – related party transactions and our notes receivable – related party transactions as being fair and reasonable to us and on terms and conditions not less favorable to us than those available***

*from unaffiliated third parties.  In addition, our audit committee reviews all such transactions.*

- Other Related Party Transactions.  *Other related party transactions are approved or ratified by our audit committee, our compensation committee, or the independent trustees, as appropriate.   In addition, our audit committee reviews all such transactions.  Our board of trustees may appoint a special committee comprised solely of independent trustees to review, approve or ratify any related party transactions.*

*Allocation Policy Agreement*

Our Advisor and our Asset Manager are affiliates of the other United Development Funding programs (UDF I, UDF II, UDF III, UDF LOF and UDF V; collectively with us, the "UDF Funds"), all of which engage in the same or similar businesses in which we engage. *We have entered into an Allocation Policy Agreement with the UDF Funds, our asset manager, and UDFH LD, which is the asset manager of UDF V, pursuant to which we may invest in the same loans and transactions as the other UDF Funds, except that UDF V will not invest with us or other affiliates in the same loans*.

\* \* \*

*Participation Agreement*

We are party to a Participation Agreement among us, UDF I, UDF II, UDF III, UDF LOF and our Asset Manager. This Participation Agreement applies to all of the UDF Funds except for UDF V. *Under the Participation Agreement, we may invest in the same loans in which UDF I, UDF II, UDF III and UDF LOF invest.* We believe that we will be able to invest in a more diversified portfolio of loans and benefit from integrated exit strategies if we are able to hold loans jointly with our affiliates.  The lifecycle of single-family lot development and home construction generally begins with the acquisition of land for development of single-family lots, followed by the entitlement and engineering of the subject property, followed by the development of raw land into a finished lot, followed by the construction and sale of a single-family home.  There are differing levels of capital appreciation, cash flow, loan-to-value ratios, development risk, market risk and investment yields over the course of the development lifecycle.  UDF I, UDF II, UDF III, UDF LOF and we invest, or will invest, in substantially similar land development opportunities, although such investments may be made at different points in the development lifecycle in accordance with the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of the respective fund at the time the investment is made.  In addition, UDF I, UDF II, UDF III, UDF LOF and we will determine to exit investments in land development and home construction projects at different points in the development lifecycle in accordance with the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of

the respective fund at the time the exit is made. Subject to the respective limitations set forth in the organizational and operational documents of each of UDF I, UDF II, UDF III, UDF LOF and us, investments may be entered into as loan participations or joint ventures between two or more of these funds, and may be sold to or refinanced by one or more other of such funds in accordance with the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of the respective fund.

**[Land Development]is the asset manager of UDF I, UDF II, UDF LOF and us and the general partner of UDF III. In exercising its duties to each of these funds, [Land Development] will manage each investment in accordance with the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of the respective fund as each investment progresses. UDF I, UDF II, UDF III, UDF LOF and we each recognize that, in exercising its duties to each fund, [Land Development] will encounter conflicts of interest. Thus, each of these funds and [Land Development] seeks to equitably apportion investment opportunities among and between such entities in accordance with each fund's investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances at the time each transaction opportunity is presented by [Land Development].**

Our Participation Agreement provides that, unless the organizational and operational documents of a fund are more restrictive:

- **No loan shall be sold between UDF I, UDF II, UDF III, UDF LOF and/or us for an amount in excess of the outstanding loan balance, including accrued interest, at the time of the sale; provided, however, that this does not prohibit the acquiring entity from subsequently restructuring the loan in any way, including an increase in the loan amount.**

- **No asset shall be sold between UDF I, UDF II, UDF III, UDF LOF and/or us for an amount in excess of its fair market value as determined by an independent expert; provided, however, that this does not prohibit the financing of the investment by one of the other such funds.**

Under the Participation Agreement, the amount invested in each transaction opportunity (including any investment, co-investment, joint venture, participation, refinancing or sale) that qualifies for the investment criteria, yield requirements, cash flow expectations, investment horizon and risk tolerances of any two or more of UDF I, UDF II, UDF III, UDF LOF and/or us, shall be allocated among the funds as follows:

- each respective entity will be allocated a percentage of the transaction opportunity determined as the ratio of the total amount of "equity invested" in such entity over the "total combined equity invested," such percentage being the "investment percentage." For purposes of the participation agreement, "equity invested" shall include both direct investment and retained earnings as

determined by the most recently available audited or unaudited financial statements prepared by the respective entities as completed with respect to the most recent calendar quarter.  For purposes of this paragraph, "total combined equity invested" shall mean the sum of the equity invested in each of UDF I, UDF II, UDF III, UDF LOF and us.  Each of the respective entities will invest in such transaction opportunity an amount equal to the investment percentage multiplied by the amount of "required cash."  For purposes of the participation agreement, "required cash" means the aggregate amount of cash required to be invested by the respective UDF Fund in the transaction opportunity;

* * *

*Advisory Agreement*

We have entered into the New Advisory Agreement with our Advisor. The New Advisory Agreement provides that ***the Advisor shall undertake to use its commercially reasonable best efforts to present to us potential investment opportunities consistent with the investment objectives and policies as determined from time to time by our board of trustees***.

Under the New Advisory Agreement, the Advisor shall:

- ***Promptly disclose to our board of trustees the existence of any condition or circumstance, existing or anticipated, of which it has knowledge, which creates or could create a conflict of interest between the Advisor's obligations to us and its obligation to or its interest in any other person***;

- Allocate investment opportunities among us and the other persons managed or sponsored by the Advisor, any trustee or their affiliates in accordance with the Participation Agreement and ***shall inform our board of trustees at least quarterly of the investment opportunities that have been offered to other programs with similar investment objectives sponsored by the Advisor, any trustee or their affiliates. If the Advisor, any trustee or affiliates thereof have sponsored other investment programs with similar investment objectives which have investment funds available at the same time as us, it shall be the duty of the board (including the independent trustees) to adopt the method set forth in the Participation Agreement or another reasonable method by which investments are to be allocated to the competing investment entities and to use their best efforts to apply such method fairly to us***.

[Emphasis added.]

102.    These representations were false and misleading for the same reasons stated *supra* in ¶96.

103.    These false and misleading statements and omissions were an essential link in the election of the Trustee Defendants to the Board of UDF IV.  This April 2015 Proxy harmed UDF IV by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Trustee Defendants continued to harm UDF IV by loaning money to interested parties ("straw borrowers") to circumvent the limitations of the REIT tax structure, dangerously concentrating UDF IV's loan portfolio into just a handful of interested parties.[12]

## DEMAND ALLEGATIONS

### Plaintiffs Have Served a Demand on the Board of Trustees

104.    On September 20, 2016, Plaintiffs Baxter and Ostlund sent a demand letter to Defendant Greenlaw and the Board of Trustees via United Parcel Service (the "Demand").  The letter detailed the allegations asserted by Hayman, including the resemblance of the Company's business to a Ponzi scheme, the self-interested transactions by UDF IV's executives, claims that the Company engaged in prohibited transactions to evade applicable IRS regulation for mortgage REITs, and other irregular events surrounding the Company.  The letter demanded that the Board, on behalf of the Company: (1) require the culpable Company officers and trustees to indemnify the Company for the costs associated with defending the SEC and FBI investigations and the shareholder lawsuits; (2) require the culpable officers and trustees to indemnify the Company for all costs incurred from the Company's internal investigation into the Hayman Capital allegations; (3) claw back all compensation and benefits paid to the culpable officers and trustees who breached their fiduciary duties to UDF IV; and (4) put forward for shareholder vote a resolution for amendments to the Company's By-Laws or Articles of Incorporation that would

---

[12]    Trustee Defendants Greenlaw, Marshall, Finkle, and Malone filed similarly misleading proxies between 2008 and 2013 in order to protect their hold on the Company.

effectively strengthen the Company's internal governance controls to detect and prevent the conduct detailed in the Hayman reports from occurring again.

105.    On October 4, 2016, the Board responded to Plaintiffs' Demand, stating that the Trustee Defendants had instituted a Demand Review Committee and attaching a copy of the minutes of an April 29, 2016 Board meeting instituting the Committee.  Trustee Defendants Marshall, Malone, Finkle, Greenlaw, and Dwyer attended the April 29, 2016 meeting.  Trustee Defendants Greenlaw and Dwyer recused themselves from the meeting due to their management position in the Company.

106.    Trustee Defendants Finkle, Malone, and Marshall then unanimously adopted a resolution whereby Marshall and Malone were appointed as the sole members of the Demand Review Committee.  The Demand Review Committee is thus comprised solely of culpable Trustee Defendants who are incapable of independently considering the Demand pending against the Company, and who could not possibly carry out their duties to investigate the Demand in good faith.  Accordingly, the Demand Review Committee is no impediment to Plaintiffs commencing and prosecuting this action on behalf of the Company.

107.    On December 12, 2016, counsel for Plaintiffs Baxter and Ostlund sent a follow-up email to counsel for the Company asking for an update on the status of the Demand Review Committee's investigation.  Specifically, Plaintiffs asked for an update regarding:

> (i)      the current status of the investigation;
>
> (ii)     what the Demand Review Committee ("DRC") has done to investigate the allegations;

(iii)      whether the DRC had uncovered any evidence of wrongdoing, and, if so, identified the Board Members and/or UDF IV executives or employees culpable for the wrongdoing;

(iv)      whether any specific remedial actions had been taken or proposed;

(v)      the status of the SEC's enforcement action against UDF IV, and whether the DRC was working with the SEC in its investigation;

(vi)      when UDF IV expected to file its annual report on Form 10-K for 2015, and its quarterly reports on Form 10-Q for the first, second, and third quarters of 2016;

(vii)      whether the DRC had prepared any reports setting forth its findings and, if not, whether the DRC planned to prepare any such report and at what time; and

(viii)      whether the DRC would share the contents of its report and findings with Plaintiffs.

108.    On December 21, 2016, counsel for UDF IV responded by stating through a responding email, stating in full: "The Committee is not yet finished with its work.  It is also waiting for the audit to be completed.  If you possess additional information or material you want the Committee to consider, please forward it to my attention."

109.    This statement from counsel conflicts with UDF IV's public statements on June 8, 2016 disclosing that the Company "ha[d] engaged a new independent registered public accounting firm, and the audit process began immediately," disclosed through a September 14, 2016 Form 8-K filed with the SEC, and that: "[a]n independent internal investigation was conducted by Thompson & Knight LLP, assisted by forensic accountants from a national

accounting firm, which found no evidence of fraud or misconduct on the part of UDF IV, its management, or its advisor. The investigation team did identify certain areas for remedial improvement, which UDF IV is implementing," released on May 8, 2017 through an additional Form 8-K filed with the SEC.

110.     The burden is on the Board and the Demand Review Committee to prove that it acted independently, in good faith and with reasonable procedures in investigating the Demand. *Oliveira v. Sugarman,* 152 A.3d 728, 738-39 (Md. 2017). In this case, the Board and Demand Review Committee failed to act independently and in good faith to investigate the allegations in the Demand. Accordingly there is no impediment to Plaintiffs commencing and prosecuting this action on behalf of the Company.

**DERIVATIVE ALLEGATIONS**

111.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

112.     Plaintiffs bring Counts I, II, and III derivatively on behalf of and for the benefit of the Company, to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein.

113.     Plaintiffs purchased shares of UDF IV beginning on December 6, 2012, and have held said shares continuously through the present time. Thus, Plaintiffs were UDF IV stockholders during the wrongdoing complained of herein.

114.     Plaintiffs will fairly and adequately represent the interests of the Company, and have retained counsel experienced in derivative litigation to enforce and prosecute this action.

115.     This is not a collusive action to confer jurisdiction on the Court which it would not otherwise have.

## COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against the Trustee Defendants)

116.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

117.     As Trustees of the Company, each Trustee Defendant owed the Company and its shareholders the fiduciary obligations of loyalty and due care.

118.     As demonstrated by the allegations above, the Trustee Defendants have allowed UDF IV to engage in related-party transactions, the intention of which was not to benefit UDF IV, and have failed to maintain proper oversight over the management of the Company's business.

119.     As a result of the Trustee Defendants' actions, the Company has been and will be damaged.

120.     Plaintiffs and the Company have no adequate remedy at law.

## COUNT II
### Violation of Section 14(a) of the Exchange Act
### (Directly Against the Trustee Defendants)

121.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

122.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

123.     The Trustee Defendants exercised control over UDF IV and caused UDF IV to disseminate the false and misleading May 2014 Proxy and April 2015 Proxy.  These Proxies materially misrepresented that the UDF IV Board of Trustees were independent and properly overseeing the UDF IV's operations, and that UDF IV had proper conflict resolution controls in place to prevent self-interested transactions from occurring to the detriment of UDF IV and its stockholders.

124.     As stated herein, these Proxies contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  These false statements and omissions were essential links in the election of the Trustee Defendants to UDF IV's Board of Trustees and the continued illegal management of UDF IV.

125.     The written communications made by the Trustee Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

126.     At all relevant times to the dissemination of the materially false and/or misleading Proxies, the Trustee Defendants were aware of and/or had access to the true facts concerning UDF IV's operation.

127.     UDF IV has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT III
## Violation of Section 29(b) of the Exchange Act
## (Directly Against the Trustee Defendants)

128.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

129.    The Trustee Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Trustee Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because the Trustee Defendants violated §14 by issuing false and misleading reports to UDF IV shareholders regarding the nature of, and responsibility for, the wrongdoing complained of herein.  All of the payments the Trustee Defendants received are therefore voidable by UDF IV under §29(b) of the Exchange Act.

130.    UDF IV is in privity with the Trustee Defendants with respect to the incentive compensation and fees provided by UDF IV to the Trustee Defendants.  The Trustee Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

131.    UDF IV has been severely injured by this misconduct of the Trustee Defendants.  Accordingly, UDF IV is entitled to damages, *i.e.*, rescission of the incentive compensation and fees granted to the Trustee Defendants.

## COUNT IV
## Unjust Enrichment
## (Derivatively Against Defendants Greenlaw, Etter, UMTH General, and Land Development)

132.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

133.    UMTH General and Land Development, as external manager and asset manager of the Company, respectively, have been paid excessive advisor and management fees.

134.    Greenlaw and Etter, as partners in UMTH General and Land Development, have received benefits from the Company in the form of advisor and management fees.  These fees were paid by the Company to these entities which are under common control.

135. It would be unconscionable and against fundamental principles of justice, equity, and good conscience for Greenlaw, Etter, UMTH General, and Land Development to retain the benefits of these advisor and management frees.

136. Greenlaw, Etter, UMTH General, and Land Development have been unjustly enriched at the expense and to the detriment of the Company.

137. Plaintiffs and the Company have no adequate remedy at law.

**COUNT V**
**Aiding and Abetting**
**<u>(Derivatively Against UMTH General and Land Development)</u>**

138. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

139. UMTH General and Land Development have aided and abetted the Trustee Defendants' breaches of fiduciary duties.

140. As a result, Plaintiffs and the Company have been and are being harmed.

141. Plaintiffs and the Company have no adequate remedy at law.

**<u>PRAYER FOR RELIEF</u>**

142. WHEREFORE, Plaintiffs demand judgment as follows:

A. Awarding the Company the amount of damages it sustained as a result of Defendants' breaches of fiduciary duties;

B. Compelling Defendants to disgorge to the Company the benefits they have received as a result of their breaches of fiduciary duties;

C. Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated:  September 13, 2017

                          Respectfully submitted,

                          KILGORE & KILGORE PLLC

                          /s/ Theodore C. Anderson
                          Theodore Anderson
                          State Bar No. 01215700
                          tca@kilgorelaw.com

                          3109 Carlisle Street
                          Dallas, TX 75204
                          Telephone: 214-969-9099
                          Facsimile:  214-953-0133
                          *Local Counsel for Plaintiffs*

                          **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

                          Geoffrey M. Johnson
                          Ohio Bar No. 0073084
                          12434 Cedar Road, Suite 12
                          Cleveland, OH 44106
                          Telephone: 216-229-6088
                          gjohnson@scott-scott.com

                          *Lead Counsel for Plaintiffs*